**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BERKYS URENA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | **3:15-CV-570** |
| **ALLSTATE INSURANCE COMPANY** | : | **(JUDGE MARIANI)** |
| **and ALLSTATE FIRE & CASUALTY** | : | |
| **INSURANCE COMPANY** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On March 23, 2015, Plaintiff, Berkys Urena, filed the above-captioned action against

Defendants Allstate Insurance Company and Allstate Fire & Casualty Insurance Company

(hereinafter collectively referred to as "Allstate") alleging Breach of Contract (Count I), Bad

Faith (Count II), and a violation of the Unfair Trade Practice & Consumer Protection Law

(Count III). (Doc. 1). Defendants subsequently filed a Motion to Dismiss (Doc. 11)

requesting that the Court dismiss Counts II and III of Plaintiff's Complaint for failure to state

a claim upon which relief can be granted. In response, Plaintiff voluntarily withdrew Count

III but argued that Count II should not be dismissed. (Doc. 13).

Thus, presently before the Court is Defendants' Motion to Dismiss (Doc. 11) with

respect to Count II of Plaintiff's Complaint. The parties have fully briefed the motion, and it

is now ripe for decision. For the reasons that follow, the Court will grant in part and deny in part Defendants' motion.

## II. FACTUAL ALLEGATIONS

Plaintiff's Complaint alleges the following well-pleaded facts, which are accepted as true for purposes of resolving the instant Motion.

Plaintiff, Berkys Urena, is an adult individual who currently resides in Pennsylvania and Defendants Allstate Insurance Company and Allstate Fire Casualty Insurance Company are Illinois corporations. (Doc. 1, ¶¶ 1, 2). Allstate sells automobile insurance coverage, among other coverages, and is licensed to conduct business in the Commonwealth of Pennsylvania, and regularly does so. (*Id*. at ¶ 3). At all material times, Allstate was Urena's insurer, and Allstate's name was affiliated with documents relating to the policy of automobile insurance relative to this matter. (*Id*. at ¶ 4).

On November 10, 2010, at approximately 5:50 p.m., Plaintiff was a front seat passenger in a Mercury Villager automobile owned and operated by Maria Polonko. (Doc. 1, ¶ 7). Despite having a stop sign at an intersection, Polonko, while operating her vehicle, pulled out directly into the path of a tractor trailer, which had the right-of-way. This caused a collision and inflicted "severe, painful and permanent injuries" upon Plaintiff. (*Id*. at ¶ 8). The proximate cause of this accident was the negligent operation of the Mercury Villager by Polonko. (*Id*. at ¶ 9).

2

Prior to the November 10, 2010 accident, Allstate had issued a policy of automobile insurance to Plaintiff Urena, with a policy number 9 28 205505 08/29 and an effective policy period from August 29, 2010 to February 28, 2011. (Doc. 1, ¶ 10). Pursuant to the terms and conditions of Plaintiff's insurance policy with Allstate, Plaintiff was an insured under the policy and her husband was the named insured. The coverage provided to Plaintiff by Allstate provided for, among other things, $100,000 in first party medical loss benefits. (*Id.* at ¶ 11).

As a result of the accident, Urena suffered a number of injuries and was treated by at least nine medical providers. (*See id.* at ¶¶ 12-13). Plaintiff alleges that during the course of her medical treatment, she received "reasonable and necessary medical treatment causally related to the subject motor vehicle accident" from all of her healthcare providers. (*Id.* at ¶ 14). Plaintiff's health care providers, in accordance with requirements of the Act 6 of the Pennsylvania Motor Vehicle Financial Responsibility Law, submitted medical records and bills for professional medical services to Allstate for payment throughout her treatment. (*Id.* at ¶ 15).

Pursuant to Act 6 of the Pennsylvania Motor Vehicle Responsibility Law, in late 2012 or early 2013, Allstate retained the services of MES Solutions to perform a Peer Review of the physical therapy management provided to Plaintiff at Hazleton Physical Therapy and at Hazleton Health and Wellness Center. (Doc. 1, ¶ 21). MES Solutions utilized Marcia Epler, PhD, PT, ATC, to perform the Peer Review. (*Id.* at ¶ 23). Allstate provided MES Solutions

3

with Plaintiff's EMS report, primary care physician records, pain management physician records, diagnostic reports, and physical therapy records. (*Id*. at ¶ 22).

On December 27, 2012, Allstate sent correspondence to Hazleton Physical Therapy, one of Plaintiff's medical providers, advising them that Allstate had submitted their bills to MES Solutions for the purpose of a Peer Review of the medical records and bills in order to confirm that the treatment, product, service, or accommodations conformed to the professional standard of performance and were medically necessary. (Doc. 1, ¶ 16).

One month later, on January 31, 2013, Allstate sent correspondence to Plaintiff's counsel's law firm advising them that Allstate had issued an Explanation of Benefits stating the reasons for nonpayment and attached a copy of that Explanation of Benefits to their correspondence evidencing that Allstate had requested a Peer Review through MES, Inc. (*Id*. at ¶ 17). On February 20, 2013, Allstate provided Plaintiff's counsel with an additional Explanation of Benefits form for Hazleton Physical Therapy once again stating that a Peer Review was being performed. (*Id*. at ¶ 18). This same day, Allstate wrote to Plaintiff's counsel's office advising that MES, Inc. was reviewing the medical records for treatment rendered to the Plaintiff for the purpose of confirming that such treatment, products, services, or accommodations conformed to the professional standard of performance and were medically necessary. The letter further stated that during this time, all pending bills would not be paid, and once the review was received all pending bills would be processed per the results of the review. (*Id*. at ¶ 19).

4

Throughout March and April of 2013, Allstate sent correspondence and Explanation of Benefits documents to Imaging Associates of Hazleton, Geisinger Clinic, and Hazleton Physical Therapy, advising them that the reason for non-payment was that the bills were being reviewed by a Peer Review service. (*Id.* at ¶ 20).

On April 6, 2013, Epler performed the Peer Review and drafted a report summarizing the Review. (*Id.* at ¶ 24). Epler's Peer Review report contained the following opinions:

1. Is treatment reasonable and necessary?
The initial evaluation of 5/30112 was both reasonable and necessary, in line with current practice standards. Are-evaluation should have been performed around 6/30/12, so that appropriate and necessary treatment modifications could be made. Without a timely re-evaluation combined with incomplete evaluation content, a low level of exercise interventions, and excessive use of heat and electrical stimulation, treatment rendered after 6/30112 has been determined not to be reasonable or necessary.

2. Is ongoing treatment reasonable and necessary?
No, ongoing treatment beyond 6/30/12 was determined to be neither reasonable nor necessary. Ms. Urena has undergone a lengthy course of physical therapy without progressive, sustained improvement. As a result, there is not justification on ongoing skilled PT intervention. Based on the PT records, there is no justification to support ongoing skilled care beyond 6/30/12.

(Doc. 1, ¶ 25; April 6, 2013 Peer Review report of Marcia Epler, PhD, PT, ATC, Doc. 1, Ex. B). Allstate received Epler's physical therapy Peer Review report on April 9, 2013. (Doc. 1, ¶ 26).

On May 8, 2013, Allstate sent correspondence and Explanation of Benefits to Hazleton Physical Therapy denying payment of the physical therapy bills. The explanation was as follows: "Based on the results of an independent Peer Review, medical justification

and/or necessity cannot be established for the services billed. Therefore, your request for reimbursement is denied." (*Id.* at ¶ 27). In May, June, and July of 2013, Allstate sent identical denial letters to Imaging Associates of Hazleton, Geisinger Clinic, Center for Advanced Surgery, Pain Care Consultants, PC and Auto RXLC. (*Id.* at ¶ 28).

As of July 19, 2013, Allstate never sent a copy of the Peer Review report to Plaintiff's counsel. (*Id.* at ¶ 29). On that day, Plaintiff's counsel faxed correspondence to Allstate requesting a copy of the Peer Review report. Allstate mailed the report to Plaintiff's counsel on July 24, 2013. (*Id.* at ¶ 30). Via correspondence, on July 29, 2013, Plaintiff's counsel advised Allstate that neither he nor Urena had received a copy of the Peer Review report and therefore Urena was denied an opportunity to request a reconsideration of the Peer Review initial determination within the thirty (30) day time frame. (*Id.* at ¶ 31). On August 21, 2013, Allstate faxed Plaintiff's counsel a copy of correspondence, allegedly sent to Plaintiff's counsel but addressed to Imaging Associates of Hazleton, regarding the Peer Review report. (Doc. 1, ¶ 33). The correspondence, dated April 16, 2013, stated:

Dear Dougherty, Leventhal & Price, LLP,

Enclosed you will find a copy of the results of the peer review pertaining to Berkys Urena and her course of treatment at Hazleton Physical Therapy and Hazleton Health and Wellness Center and any and all referrals, prescriptions, and/or diagnostic studies in connection with the above-captioned claim. Please note that no additional payments will be made by Allstate in accordance with said peer review.

The pertinent results are as follows:
• Maximum medical improvement had been reached by June 30, 2012.

6

> • All treatment, referrals, prescriptions and injections beyond June 30,
> 2012 are considered unreasonable and unnecessary.
>
> Please be advised that pursuant to the provisions of Act 6, an insurer,
> provider or insured has thirty (30) days from this date to request a
> reconsideration of the initial determination. Please note that the final
> determination for payment or denial of claim and cost of reconsideration must
> be paid by the insurance carrier initially, however the charge for the
> reconsideration is ultimately paid for by the party against whom
> reconsideration determination is made. The charge for the reconsideration will
> not exceed the charge for the initial determination. All requests must be in
> writing to MES.

(April 16, 2013 Letter from Allstate to Dougherty, Leventhal & Price LLP, Doc. 1, Ex. C).

Based upon the Peer Review, throughout 2013, 2014 and 2015, Allstate sent denial

letters to all of Plaintiff's treating medical providers, including physical therapy, physician

consultations, diagnostic studies and neurosurgery for her lumbar fusion surgery (Doc. 1, ¶

36).

Plaintiff asserts that she fully complied with the terms and conditions of the subject

insurance policy by Allstate, and all conditions precedent and subsequent to Plaintiff's right

to recover under the policy were performed or had occurred. (*Id*. at ¶ 42). Nonetheless, as

of the present day, Allstate has refused to pay any of Urena's medical providers for

treatment rendered subsequent to June 30, 2012 for injuries she sustained in the motor

vehicle accident, even after Allstate received Urena's medical reports and treatment notes

prepared by her treating physicians regarding the necessity and reasonableness of her

medical treatment. (*Id*. at ¶ 43). As a result of Allstate's conduct, Urena utilized her private

health insurance to pay for her accident related treatment, including her lumbar spine

surgery. She therefore incurred a subrogation lien for those medical payments in the

amount of $82,480.54. (*Id.* at ¶ 46).

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it

does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement

to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of

action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations

omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above

the speculative level." *Id.* A court "take[s] as true all the factual allegations in the Complaint

and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal

conclusions and threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231

n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to
> determine the sufficiency of a complaint: First, the court must take note of the

8

elements a plaintiff must plead to state a claim. Second, the court should
identify allegations that, because they are no more than conclusions, are not
entitled to the assumption of truth. Finally, where there are well-pleaded
factual allegations, a court should assume their veracity and then determine
whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not show[n]—that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and

quotation marks ornitted). This "plausibility" determination will be a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. ANALYSIS

Count II of Plaintiff's Complaint alleges Bad Faith on the part of the Defendants

pursuant to 42 P.S. § 8371 and sets forth 23 allegations in support of this claim. (Doc. 1, ¶

58(a)-(w)). Defendants argue that Plaintiff's claim for statutory bad faith "should be

dismissed, since the Pennsylvania Motor Vehicle Financial Responsibility Law provides

remedies inconsistent with the bad faith statute and, therefore, preempts its application."

(Doc. 12, at 4).

Pursuant to the Pennsylvania bad faith statute,

In an action arising under an insurance policy, if the court finds that the
insurer has acted in bad faith toward the insured, the court may take all of the
following actions:
(1) Award interest on the amount of the claim from the date the claim was
made by the insured in an amount equal to the prime rate of interest plus
3%.

9

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371. "In the insurance context, the term bad faith has acquired a

particular meaning," to wit:

> "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay
> proceeds of a policy; it is not necessary that such refusal be fraudulent. For
> purposes of an action against an insurer for failure to pay a claim, such
> conduct imports a dishonest purpose and means a breach of a known duty
> (i.e., good faith and fair dealing), through some motive of self-interest or ill
> will; mere negligence or bad judgment is not bad faith.

*Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)

(quoting Black's Law Dictionary 139 (6th ed. 1990)).

"The standard for bad faith claims under § 8371 is set forth in *Terletsky*." *Klinger*

*v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997). "There, the

Pennsylvania Superior Court applied a two-part test, both elements of which must be

supported with clear and convincing evidence: (1) that the insurer lacked a reasonable

basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack

of reasonable basis." *Id.*

In turn, the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL")

requires an insurer issuing or delivering liability insurance policies of a motor vehicle to

provide coverage "for reasonable and necessary medical treatment and rehabilitative

10

services."[1] 75 Pa.C.S.A. § 1712(1). Section 1797 sets forth the manner in which the

insurer can evaluate the reasonableness and necessity of the medical and rehabilitative

services. For challenges to the reasonableness and necessity of treatment, an insurer can

contract with any peer review organization ("PRO") "established for the purpose of

evaluating treatment, health care services, products or accommodations provided to any

injured person. Such evaluation shall be for the purpose of confirming that such treatment,

products, services or accommodations conform to the professional standards of

performance and are medically necessary." *Id.* at § 1797(b)(1). The insurer, provider, or

insured may request reconsideration by the PRO of the PRO's initial determination within 30

days of that PRO's initial determination. *Id.* at § 1797(b)(2).

While § 8371 is a general statute, applicable to all insurance claims, § 1797(b) is a

statutory provision that provides "specific relief for claims of first-party medical benefits."

*Miller v. Allstate Fire & Cas. Ins. Co.,* 2009 WL 577964, *9 (W.D. Pa. 2009) (citing *Harris v.*

*Lumberman's Mut. Cas. Co.,* 409 F.Supp.2d 618, 620-621 (E.D. Pa. 2006)). Thus, "[w]here

both the Pennsylvania MVFRL and the Pennsylvania Bad Faith statutes are premised on

the same conduct, *i.e.* an unreasonable denial of first-party benefits, the statutes are

irreconcilable and, as the specific provisions of the MVFRL will preempt the general

provisions of Pennsylvania bad faith statute." *Id.* (citing *Gemini Physical Therapy and*

---

[1] These services include, but are not limited to, "hospital, dental, surgical, psychiatric, psychological, osteopathic, ambulance, chiropractic, licensed physical therapy, nursing services, vocational rehabilitation and occupational therapy, speech pathology and audiology, optometric services, medications, medical supplies and prosthetic devices . . . ." 75 Pa.C.S.A. § 1712(1).

11

*Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 67 (3d Cir. 1994); *Harris*, 409

F.Supp.2d at 620-621). However, where a plaintiff's claims are premised on conduct

beyond the scope of § 1797, such as an insurance company's alleged abuse of the peer

review process, alleged mishandling of the insured's claims, or unreasonable denial of

benefits based on a peer review report, several courts have predicted that the Pennsylvania

Supreme Court will find that these claims may proceed pursuant to Pennsylvania's Bad

Faith Statute. *Miller*, 2009 WL 577964, at *8, 9. "[C]laims of the mishandling of insurance

claims and the abuse or misuse of the peer review process fall outside the scope of the

protections afforded an insured by the MVFRL because the MVFRL does not provide

specific relief for such claims." *Miller*, 2009 WL 577964, at *9. *See Perkins v. State Farm

Ins. Co.*, 589 F.Supp.2d 559 (M.D. Pa. 2008); *Hickey v. Allstate Prop. and Cas. Ins. Co.*,

722 F.Supp.2d 609, 614 (M.D. Pa. 2010)("[S]ection 8371 is preempted by section

1797 where an insured alleges only that an insurer wrongly denied payment of first-party

medical benefits based on a determination of the propriety of treatment and the associated

charges. Claims based on allegations outside this narrow scope, such as a claim involving

contract interpretation, a claim of abuse of the PRO process, or a claim disputing the cause

of injury, go beyond the scope of section 1797 and may be pursued under section 8371.");

*Gibson v. Progressive Specialty Ins., Co.*, 2015 WL 2337294, at *3 (E.D. Pa. 2015)

(agreeing with recent federal and state court decisions which found that an insured is not

precluded from seeking damages under § 8371 if the insured's bad faith allegations are

beyond the scope of § 1797(b), "such as claims involving contract interpretation or claims that the insurer did not properly invoke or follow the PRO process."). "Allowing a bad faith claim where an insurer abuses the PRO process gives effect to the intent of both § 1797 and § 8371 by ensuring that insurers utilize the PRO process only for its stated purposes - determining the reasonableness and necessity of treatment - and preserving the broad remedial provisions enacted by the bad faith statute." *Perkins*, 589 F.Supp.2d at 566 (summarizing the findings of *Schwartz v. State Farm Ins. Co.*, 1996 WL 189839 (E.D. Pa. 1996) and finding this reasoning persuasive.).

The relevant inquiry here is therefore whether the misconduct alleged by Plaintiff in support of her Bad Faith claim falls outside the scope of § 1797. In Count II, Berkys alleges that Defendants violated the provisions of § 8371 by "engag[ing] in a pattern of Bad Faith conduct against its insured", by doing, among other things, the following:

a. failing to pay the first party medical benefits due to the Plaintiff for injuries she sustained in the subject motor vehicle accident;

b. failing to objectively and fairly evaluate Plaintiff's first party medical benefit claim;

c. refusing to effectuate a prompt and fair resolution of the Plaintiff's first party medical benefit claim;

d. failing to promptly, objectively and fairly evaluate the Plaintiff's claim for first party benefits;

e. compelling the institution of this Complaint in order to obtain policy benefits that should have been paid promptly and without the necessity of litigation;

f. asserting defenses without a reasonable basis in fact;

13

g. engaging in dilatory and abusive claims handling;

h. failing to investigate the Plaintiff's claim within a reasonable time limit;

i. repeatedly delaying and terminating the Plaintiff's first party medical benefits in order to cause her financial hardship so that the Plaintiff would discontinue her treatment and her claims for first party medical benefits;

j. terminating Plaintiff's first party medical benefits for the sole purpose of placing its own financial interest before that of its insured in order to limit its exposure of paying Berkys Urena's first party medical benefits pursuant to her policy with a $100,000 coverage limit;

k. deciding to retain a Peer Review Organization for the sole purpose of terminating the first party medical benefits of their insured, Berkys Urena, when Allstate had no reasonable basis to do so and consciously disregarding their lack of reasonable basis to terminate their insured's first party medical benefits;

l. violating 40 P .S. § 1171.1 (Unfair Insurance Practices Act) and 40 P .S. § 1171.5 (Unfair Methods of Competition and Unfair or Deceptive Acts or Practices) evidenced by the above actions and/or inactions of Defendant Allstate;

m. reporting to offer $100,000 in first party medical benefits, when in fact, Allstate had no intention of providing this coverage;

n. representing that the Plaintiff purchased $100,000 in first party medical benefits, when in fact, said promise was wholly illusory;

o. charging a premium based upon $100,000 in first party medical benefits, when in fact, Allstate purposely avoided fulfilling its contract with the Plaintiff;

p. representing that the Plaintiff purchased $100,000 in first party medical benefits, when in fact, Allstate without justification, refused and continues to refuse to pay said benefits;

q. denying Plaintiff first party medical benefits without a reasonable basis;

14

r. denying Plaintiff first party medical benefits with the knowledge, or a reckless disregard, that such denial was without a reasonable basis;

s. violating the policy and covenant of Good Faith and Fair Dealing.

t. retaining the Peer Review Organization to challenge the reasonableness and necessity of the Plaintiff's medical treatment in order to force the Plaintiff's healthcare providers to stop treatment necessary for accident related injuries and to assist in the defense and to compromise Plaintiff's claims for first party medical benefits;

u. improperly utilizing the Peer Review process to challenge the reasonableness and necessity of Plaintiff's medical treatment from all of her medical providers when only obtaining a Peer Review of the Plaintiff's physical therapy treatment in order to protect its own financial interests and cause financial hardship to the Plaintiff so that the Plaintiff would discontinue or compromise her claim for first party medical benefits;

v. violating 75 Pa. C.S.A. Section 1797(b) by improperly utilizing the Peer Review performed by physical therapists to deny payment of the Plaintiff's medical treatment from all of her providers; and

w. retaining a Peer Review organization to challenge the reasonableness and necessity of the Plaintiff's physical therapy treatment and then utilizing the physical therapy Peer Review to deny payment of all of the Plaintiff's medical treatment from all of her providers in violation of 75 Pa. C.S.A. Section 1797.

(Doc. 1, ¶ 58).

Defendants assert that "Plaintiff's allegations merely challenge Defendants' decision to deny first-party benefits, based on a peer review, which falls squarely within § 1797(b) of the MVFRL" and therefore "[s]ince Defendants followed the statutory process created by the legislature for the handling of these types of claims, Plaintiff's remedies are limited to those the legislature made available pursuant to the Pennsylvania MVFRL." (Doc. 12, at 8). In turn, Plaintiff argues that this action does not only stem from the Defendants' use of the

peer review process, but rather from "the Defendants knowing, willful and reckless misuse and abuse of the peer review process" as well as "the Defendants' knowing failure to objectively and fairly evaluate the Plaintiff's claim for first party benefits based upon the abuse, misuse and nonadherence to the peer review process." (Doc. 13, at 5). While the Court finds that Defendants' argument construes the allegations in Plaintiff's Complaint too broadly, case law supports Defendants' position with respect to several of Plaintiff's claims.

Subsections (a)-(d) and (h) fall squarely within the MVFRL and Courts have repeatedly, and almost uniformly, so held. Allegations such as a failure to pay the first party benefits due to a Plaintiff or failing to effectuate a prompt and fair resolution of the Plaintiff's first party medical benefit claim merely challenge the reasonableness and necessity of the medical treatment and the resulting denial of first party medical benefits, which are precisely the type of claims meant to be encompassed by the MVFRL. *See Perkins*, 589 F.Supp.2d at 566 (finding that State Farm's "alleged failures to conduct a reasonable investigation, [or] fairly evaluate coverage . . . are nothing more than a challenge to the denial of first-party benefits and would fall under § 1797." ); *Hickey*, 722 F.Supp.2d at 614-615 (Plaintiff's allegations that Defendant "a) fail[ed] to pay first-party medical benefits due the Plaintiff; b) fail[ed] to objectively and fairly evaluate the Plaintiff's first-party medical benefit claim; c) fail[ed] to promptly and fairly effectuate a resolution of the Plaintiff's first-party medical benefit claim . . . " amount to a challenge to the denial of first-party benefits under § 1797, thus barring a claim under § 8371.); *Gibson*, 2015 WL 2337294, at * 3 (Plaintiff's allegations

that Progressive "failed to conduct a reasonable investigation, act in a reasonable time and in good faith, fairly evaluate coverage, and explain its decisions" are "essentially a challenge to Progressive's decision to deny first-party benefits and fall within § 1797(b)."); *Roppa v. Geico Indem. Co.*, 2010 WL 5600899, at * 7 (W.D. Pa. 2010) (report & rec.), *adopted,* 2011 WL 181531 (W.D. Pa. 2011).

However, at this stage of the proceedings and taking as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, a review the well-pleaded allegations in Plaintiff's complaint sufficiently demonstrate a claim of abuse or misuse of the peer review process. On this basis, Plaintiff may proceed with the remaining subsections of her Bad Faith claim, namely (e)-(g) and (i)-(w). Plaintiff's allegations are not merely "a challenge to the findings of or amount due from the PRO process." *See Gibson*, 2015 WL 2337294, at * 3. Nor are the aforementioned allegations challenges to the reasonableness and necessity of the medical treatment and subsequent denial of first party medical benefits. Rather, the claims are premised on a purported improper use and abuse of the peer review process which fall outside the scope of the MVFRL. Plaintiff's allegations thus sufficiently allege an abuse and misuse of the PRO process to allow her Bad Faith claims to proceed at this time.

Plaintiff also argues that "a very important aspect of the case at hand is that Defendant Allstate knowingly abused and misused the Peer Review Process by using a Physical Therapy Peer Review to deny payment of all of the Plaintiff's medical treatment."

17

(Doc. 13, at 7)(underline in original).  These allegations are specifically encompassed in Plaintiff's Bad Faith claim in paragraph 58(u)-(w).  Plaintiff's Complaint also alleges that Allstate sent denial letters to all of Plaintiff's treating medical providers, including physical therapy, physician consultations, diagnostic studies and neurosurgery for her lumbar fusion surgery.  (Doc. 1, ¶ 36).

The MVFRL requires that the initial PRO evaluation be performed by a member of the provider's profession.  *Harcourt v. General Acc. Ins. Co.*, 615 A.2d 71, 77 (Pa. Super. Ct. 1992).  "The term 'profession' is defined by Webster as 'the collective body of persons engaged in or practicing a particular calling or vocation.'"  *Id.* (quoting Webster's New Universal Unabridged Dictionary 1437 (J. McKechnie 2d ed. 1983)).  In *Harcourt*, the Court determined that chiropractors consist of a collective body of persons engaged as chiropractic practitioners and thus the appellant chiropractor in the action was entitled to an initial review by a member of this same profession.  *Id.* at 78.

The reasoning in *Harcourt* is equally applicable here.  Defendants utilized a peer review performed by a physical therapist to deny all of Plaintiff's medical bills, including payment to medical providers for treatment such as neurosurgery, a treatment performed by a person who practices in a significantly different area of medicine than a physical therapist.

Even Defendants do not attempt to argue that the peer review performed by a physical therapist was in some way appropriate to rely on when denying payment to all of Plaintiff's medical providers.  (*See* Doc. 14, at 4).  Rather, Defendants argue that *Harcourt*

supports their position because the Plaintiff chiropractor brought his claim under the MVFRL and the "defendant's failure to properly adhere to the PRO process by failing to have the initial review performed by a member of his own profession" was within the purview of the MVFRL because it stemmed from the use of the peer review process. (*Id.*). Such an interpretation is too narrow. In *Harcourt*, the plaintiff was not alleging that the insurance company failed to have the initial review performed by a member of his own profession for any abusive or inappropriate purpose. Further, at issue there was only the payment of medical bills to the chiropractor. Here, Plaintiff specifically alleges that Allstate improperly utilized the peer review process by obtaining a peer review of the plaintiff's physical therapy treatment for its own financial interests and to force Plaintiff to discontinue or compromise her first party medical benefits claim. (Doc. 1, ¶ 58(u)). Additionally, unlike in *Harcourt*, Defendants' blanket denial of all payments applied to multiple medical professions, not simply one.

Finally, Plaintiff argues that "to not provide the attorney for the Plaintiff insured a copy of the peer review report so that an insured can institute her right for a reconsideration within thirty (30) days is also a severe misuse and abuse of the peer review process." (Doc. 13, at 8). According to Plaintiff, although Allstate received the physical therapy peer review report on April 9, 2013, as of July, 2013, Allstate never sent a copy of the report to Plaintiff's counsel. (Doc. 1, ¶¶ 26, 29). After requesting a copy of the peer review report from Allstate, the defendants mailed the report to Plaintiff's counsel on July 24, 2013. (*Id.* at ¶

30). Via correspondence, on July 29, 2013, Plaintiff's counsel advised Allstate that neither he nor Urena had received a copy of the peer review report. (*Id.* at ¶ 31).   In August, 2013, Allstate faxed Plaintiff's counsel a copy of correspondence, allegedly sent to Plaintiff's counsel but addressed to Imaging Associates of Hazleton, regarding the peer review report. (*Id.* at ¶ 33).   While Defendants dispute the allegation that Plaintiff's attorney did not receive the peer review report in April, 2013 (Doc. 14, at 1-2), it is not for the Court to determine the veracity of Plaintiff's allegation in a motion to dismiss.  To not notify the Plaintiff or her attorney of the results of peer review report or timely provide them with a copy, as Plaintiff alleges, deprives her of her statutory right to request reconsideration of the peer review report.  Such alleged conduct on the part of Defendants falls outside the narrow scope of the MVFRL, as it does not go to the reasonableness or necessity of the medical and rehabilitative services, but rather raises a question of whether Allstate abused or misused the peer review process and whether it properly followed the peer review process.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 13) will be granted in part and denied in part. A separate Order follows.

Robert D. Mariani
United States District Judge

20